David S. Kupetz (CA Bar No. 125062)
  dkupetz@sulmeyerlaw.com
Mark S. Horoupian (CA Bar No. 175373)
  mhoroupian@sulmeyerlaw.com
**Sulmeyer**Kupetz
A Professional Corporation
333 South Hope Street, Thirty-Fifth Floor
Los Angeles, California 90071-1406
Telephone: 213.626.2311
Facsimile: 213.629.4520

Bankruptcy Counsel for eStyle, Inc.,
Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>ESTYLE, INC., a Delaware corporation, dba babystyle, Cadeau, and Cadeau Designs,<br><br>Debtor.<br><br>Tax Id # 95-4712564 | Case No. 2:08-bk-13518-SB<br><br>Chapter 11<br><br>**ORDER AUTHORIZING AND APPROVING: (1) THE SALE OF ASSETS OF ESTYLE, INC. FREE AND CLEAR OF LIENS, AND (2) THE ASSUMPTION AND ASSIGNMENT OF NONRESIDENTIAL REAL PROPERTY LEASES AND EXECUTORY CONTRACTS IN CONNECTION THEREWITH**<br><br>DATE: July 16, 2008<br>TIME: 9:00 a.m.<br>PLACE: U.S. Bankruptcy Court<br>Courtroom 1575<br>255 East Temple Street<br>Los Angeles, CA 90012 |

The "Motion for Order Authorizing and Approving: (1) the Sale of Assets of eStyle, Inc., Free and Clear of Liens, and (2) the Assumption and Assignment of Unexpired Nonresidential Real Property Leases and Executory Contracts in Connection Therewith" (the "Sale Approval Motion")[1] filed by eStyle, Inc. (the "Debtor"), came on for a continued hearing before the Court on July 15, 2008, which was reconvened on July 16,

---

[1] Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the Sale Approval Motion.

[MSH\ORD\520794.3 7/16/2008 (8:12 AM)]

2008.[2] Pursuant to the Sale Approval Motion, the Debtor sought an order (this "Sale Approval Order") under 11 U.S.C. §§ 105(a), 363 and 365 and Fed. R. Bankr. P. 2002, 6004 and 6006(a): (1) authorizing Debtor to sell assets (the "Transferred Assets" or "Assets") to TRS Acquisition Subsidiary Company, Inc., a Delaware corporation (the "Purchaser"), or to any successful qualified overbidder (the "Successful Overbidder"), as the case may be, free and clear of all Liens[3], Claims[4] and interests, pursuant to that certain Asset Purchase Agreement between the Debtor and Purchaser, dated as of June 18, 2008 (the "Purchase Agreement"), a copy of which is attached hereto as Exhibit 1, and sale procedures previously approved by the Court (the "Sale Procedures"); (2) authorizing the assumption by the Debtor and the assignment to Purchaser of each executory contract and unexpired lease listed on Schedules 1.1(a), 1.1(b) and 1.1(h) to the Purchase Agreement, as supplemented or modified by the Modified Assumption List (the "Modified Assumption List") filed and served prior to the Sale Hearing (collectively, the "Assumed Contracts"), and determining the amount of any Cure Payment required to be paid in connection therewith; (3) authorizing the Debtor, and its officers, to execute the

---

[2] An initial hearing on the Sale Motion was conducted on July 8, 2008 at or about 2:00 p.m. The continued hearing was set to address, among other things, the objections by certain of the Debtor's landlords regarding the issue of adequate assurance of future performance under the leases proposed to be assigned to the Purchaser.

[3] As used herein, "Lien" means, with respect to any asset: all title defects or objections, mortgages, deeds of trust, liens, charges, pledges, hypothecations, security interests, or other encumbrances of any nature whatsoever, whether domestic or foreign, including licenses, leases, chattel or other mortgages, possessory interests, collateral security arrangements, conditional and installment sales agreements, charges, easements, encroachments, options, rights of first refusal, rights of first offer, rights of use or occupancy, restrictions on transfer (voting or otherwise), royalty obligations, consignment rights, conditional sale and or title retention agreements, constructive or resulting trusts, charges of any kind, restrictions on use, attachments or provisional attachments of any kind and other title or interest retention arrangements, reservations or limitations of any nature, any filing or agreement to file a financing statement as debtor under the Uniform Commercial Code or any similar authority, or any subordination agreement in favor of another person, whether created by contract, order, operation of law or otherwise.

[4] As used herein, "Claims" means any claims (as that term is defined in 11 U.S.C. § 101(5), liabilities or obligations (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), demands, judgments, guaranties, options, rights, contractual commitments, restrictions, interests and matters of any kind and nature, whether arising prior to or subsequent to the commencement of this case, and whether imposed by agreement, understanding, law, equity or otherwise.

Purchase Agreement and all other applicable documents and take any and all actions necessary to complete the proposed sale transaction; (4) finding that Purchaser is a good faith purchaser within the meaning of 11 U.S.C. § 363(m); and (5) waiving the ten-day stay provisions of Fed. R. Bankr. P. 6004(g) and 6006(d).

On June 27, 2008, the Court entered an order (the "Sale Procedure Order") approving, among other things, the proposed sale, bidding and auction procedures and notice of the hearing on the Sale Approval Motion. The Court reviewed and considered: (1) the Sale Approval Motion (and all papers filed in support of the Motion); (2) the Modified Assumption List (as attached to the Updated Purchase Agreement filed on July 2, 2008); (3) the Purchase Agreement, including, without limitation, the Total Purchase Price (as defined in the Purchase Agreement); (4) objections and replies, if any, to the relief requested in the Sale Approval Motion, including the assumption and assignment of the Assumed Contracts; and (5) the arguments of counsel made, and all evidence presented, at the Sale Hearing. Based on the foregoing and the facts and circumstances of this case and applicable law, it is hereby

**FOUND AND DETERMINED THAT:**[5]

A.  This Court has jurisdiction over the Sale Motion under 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A). Venue of this case and the Sale Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

B.  The statutory predicates for the relief sought in the Sale Motion are sections 105(a), 363 and 365 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "Bankruptcy Code") and Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

C.  This Court has entered the Sale Procedure Order.

---

[5] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See Fed. R. Bankr. P. 7052.

1    ~~CB~~    D.    As evidenced by the declarations of service filed with this Court,
2    ~~adequate and sufficient~~nt notice under the circumstances of the Sale Approval Motion, the
3    Modified Assumption List, the Sale Procedures, the Sale Hearing, the Purchase
4    Agreement and the transactions contemplated thereby has been provided in accordance
5    with the Sale Procedure Order.
6        E.    The sale price for the assets of the Debtor is greater than the
7    aggregate value of all liens on the Debtor's assets.
8        F.    Good and sufficient reasons for approval of the Purchase
9    Agreement, and the sale (the "Sale") of the Transferred Assets as contemplated therein,
10   have been articulated.  The relief requested in the Sale Approval Motion is in the best
11   interests of the Debtor, its bankruptcy estate, its creditors and other parties in interest.
12       G.    The Debtor has demonstrated both (1) good, sufficient and sound
13   business purpose and justification and (2) compelling circumstances for the Sale other
14   than in the ordinary course of business, pursuant to section 363(a) of the Bankruptcy
15   Code, in that, among other things, the immediate consummation of the Sale to Purchaser
16   is necessary and appropriate to maximize the value of the Debtor's estate and the Sale
17   will provide the means for the Debtor to maximize distributions to creditors.  Further,
18   closing the Sale to Purchaser in an expeditious manner is important due to: (1) the
19   Debtor's limited financial capabilities; (2) the performance of the Debtor's retail operations
20   below projections; (3) the debt burden weighing down the Debtor; (4) the risk that the
21   Debtor could run low or out of funds in the near future and be forced to discontinue
22   business operations; (5) the severe negative impact on the value of the Debtor's
23   business and assets if the Debtor were forced to cease operations; and (6) the risk that
24   delay could severely undermine the opportunity for creditor recovery in this case.
25       H.    The Debtor has demonstrated that (1) no defaults exist under the
26   Assumed Contracts (real property leases and other executory contracts to be assumed
27   and assigned pursuant to the Sale) that give any non-Debtor party to an Assumed
28   Contract the right to a cure payment, other compensation on account of a default, or

[MSH\ORD\520794.3 7/16/2008 (8:12 AM)]                3

(2) except as otherwise provided in this Order, the cure payments proposed to be paid by Debtor in the Cure Schedule filed by the Debtor on June 26, 2008, including those listed as zero, cures or provides adequate assurance or compensation for any default or actual pecuniary loss relating to such defaults under sections 365(1) of the Bankruptcy Code.

I. Adequate assurance of future performance has been provided with respect to the real property leases and other executory contracts to be assumed and assigned in connection with the Sale and in accordance with the Purchase Agreement.

J. The Purchase Agreement was negotiated, proposed and entered into by the Debtor and Purchaser, without collusion, in good faith and from arms' length bargaining positions. Purchaser is not an "insider" of the Debtor, as that term is defined in section 101 of the Bankruptcy Code.

K. The consideration provided by Purchaser pursuant to the Purchase Agreement (1) is fair and reasonable, and (2) is the highest and best offer in terms of value to the Debtor's bankruptcy estate for the Assets.

**ORDERED, ~~ADJUDGED AND DECREED~~ THAT:**

1. The Sale Approval Motion is GRANTED.

2. All objections to the Sale Procedures, Auction, the Sale Approval Motion and the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are overruled on the merits.

3. The Purchase Agreement and all of the terms and conditions thereof, including, but not limited to, the sale of the Transferred Assets in exchange for the Purchase Price as set forth, and further detailed, in the Purchase Agreement, are hereby approved.

4. The Purchase Agreement is modified as follows:

(a) <u>Pro Rations</u>: Within seven (7) business days following the Closing, Seller, in cooperation with Purchaser, shall prepare a list allocating, on a straight-line amortization basis with respect to such obligation, the post-Closing portion of all prepaid expenses for the calendar month in which the Closing occurs relating to the

following: (a) all rent for the calendar month in which the Closing occurs paid by Seller prior to the Closing with respect to the Assumed Leases, and (b) all payments for the calendar month in which the Closing occurs made in connection with the Equipment Leases and the New Breed contract, which payments cover obligations arising under such Assumed Leases and Equipment Leases and New Breed contract from and after the Closing through the end of the calendar month in which the Closing occurs. Purchaser shall pay to Seller the post-Closing portion of such prepaid expenses via wire transfer within fifteen (15) days following the Closing. In the event that the parties cannot amicably resolve the allocation of prepaid expenses, either party may elect to submit such dispute to the Bankruptcy Court for adjudication of such dispute.

(b)     <u>Assumed Liabilities</u>:  Pursuant to the Purchase Agreement, the Purchaser was to assume those accounts payable listed in Schedule 1.3(a) as of the Closing Date, with such payables not to exceed $200,000. Purchaser has agreed to assume all liabilities listed in Schedule 1.3(a), with such schedule to be updated as of the Closing Date, on the condition that Purchaser is entitled to an adjustment against the Purchase Price for any amount assumed in excess of $200,000. The Purchaser shall pay such obligations on the later of (1) 20 days after Closing, or (2)the due date of the given obligation. Purchaser shall indemnify, defend and hold the Debtor and the Estate harmless against any and all claims for non-payment of such accounts payable listed in Schedule 1.3(a) as updated as of the Closing Date; provided, however, that Purchaser's liability shall not exceed in any event the amount listed on such updated Schedule 1.3(a) for the relevant claim or claims for which indemnification is owing.

(c)     <u>Inventory Adjustment</u>:  Seller and Purchaser acknowledge and agree that (A) on July 4, 2008, Seller provided an Updated Inventory Statement as of July 2, 2008, reflecting an Inventory cost of $4,955,411.25, (B) Purchaser conducted an Audit, pursuant to the results of which, there is no further Purchase Price Adjustment pursuant to Section 1.10(d) of the Asset Purchase Agreement, and (C) pursuant to the July 4, 2008 Updated Inventory Statement, the sole Purchase Price Adjustment pursuant

to Section 1.10 of the Asset Purchase Agreement is a decrease in the original Purchase Price by $144,588.75. In light of the continuance of the July 8, 2008 Approval Hearing, if the Sale Motion is approved at such continued Approval Hearing, Seller and Purchaser acknowledge and agree that (A) the parties shall cooperate in good faith in the preparation of a further Updated Inventory Statement(s) consistent with the preparation of the Updated Inventory Statement referenced above (the "Final Inventory Statement"), (B) Seller shall use commercially good faith reasonable efforts to provide Purchaser with the Final Inventory Statement within one (1) day prior to such continued Approval Hearing, which statement shall reflect the cost of the Inventory at the close of business on the day immediately prior to the date of the Final Inventory Statement, (C) the cost of the Inventory on the Final Inventory Statement shall represent the cost of Inventory for purposes of calculating the Purchase Price Adjustment under Section 1.10(a) of the Asset Purchase Agreement, and there shall be no further adjustments to the Purchase Price pursuant to Section 1.10 of the Asset Purchase Agreement; provided, however, that there may be other adjustments to the Purchase Price agreed to by the parties as may be reflected in motions before the Court or orders of the Court, (D) the parties shall request that the Court "walk through" the Approval Order promptly following its preparation and the parties' agreement thereto, and (E) the parties shall use commercially good faith reasonable efforts to conduct the Closing the next business day following the entry of the Approval Order.

5. Pursuant to sections 363(b) and (f) of the Bankruptcy Code, the Debtor is authorized to consummate the Sale, pursuant to and in accordance with the terms and conditions of the Purchase Agreement.

6. The Debtor is authorized to execute and deliver, and empowered to perform under, consummate and implement, the Purchase Agreement, collectively with all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement, and to take all further actions as may be requested by Purchaser for the purpose of transferring the Transferred Assets to

1  Purchaser or as may be necessary or appropriate to the performance of the obligations

2  contemplated by the Purchase Agreement and the documents, agreements, certificates

3  and instruments in connection with the Purchase Agreement.

4      7.    Except as expressly permitted or otherwise specifically provided for

5  in the Purchase Agreement or this Sale Order, pursuant to section 363(f) of the

6  Bankruptcy Code, the Transferred Assets shall be transferred to Purchaser, and, as of

7  the Closing Date, shall be free and clear of all Claims, Liens and interests of any kind or

8  nature whatsoever.

9      8.    As of the Closing, the Assumed Contracts (real property leases and

10  other executory contracts) shall be assumed by the Debtor, and assigned to Purchaser

11  pursuant to section 365 of the Bankruptcy Code, to the extent applicable.  The Debtor is

12  not assuming, at this time, the lease of the property located at 865 S. Figueroa Street,

13  Suite 2700, Los Angeles, California, and said lease will not be assigned to Purchaser.

14  The Right Start Acquisition Company shall guaranty the Purchaser's obligations under

15  the leases of non-residential real property that are assigned to it pursuant to this Order.

16  Upon the assumption by the Debtor and assignment to Purchaser of the Assumed

17  Contracts, Purchaser shall succeed to all of the right, title and interest of the Debtor

18  under the Assumed Contracts.  With respect to each of the leased locations managed by

19  Taubman Cherry Creek Shopping Center, LLC ("Cherry Creek") and Bellevue Square

20  Managers, Inc. ("Bellevue"), as additional adequate assurance of future performance, the

21  Purchaser shall provide an irrevocable letter of credit covering three (3) months rent and

22  other charges (the triple net monthly charges) for said locations until the expiration of the

23  current term of such lease, not including any extensions or renewals of the leases.  The

24  letters of credit shall be in a form acceptable to the each referenced landlord.  The

25  Debtor and Purchaser will cooperate with the landlords and execute such other

26  documents as the landlords may reasonably require to memorialize the assignments of

27  the leases.

28

9.    Pursuant to the agreement reached between the Purchaser and the Macerich Company ("Macerich") and The Irvine Company, Inc. ("Irvine Co."); :

(a)    Purchaser shall assume the liability and be assigned the credit for any year-end adjustments and reconciliations for tax, common area maintenance and other year-end adjustments under the leases for the following locations: Kierland Commons; Scottsdale Fashion Square; Manhattan Village; Valley Fair (Westfield Shoppingtown); and Sherman Oaks (Westfield Shopping).

(b)    With respect to each of the leases of the Fashion Island, Kierland Commons and Scottsdale Fashion Square locations, as additional adequate assurance of future performance to Irvine Co. and Macerich, the Purchaser shall provide an irrevocable letter of credit in an amount equal to three (3) months' rent and other monthly charges (the triple net monthly amount) with such letters of credit expiring at the end of the existing term of each lease, not including any extensions or renewals of the leases.

(c)    If, in connection with the negotiation of the provision of adequate assurance of future performance, Purchaser agrees to provide Cherry Creek or Bellevue (the "Other Objecting Landlords") with a letter of credit (or similar form of additional assurance, e.g. a deposit) covering more than three (3) months' rent and other monthly charges (as measured by the lease terms with such Other Objecting Landlord), then Buyer will provide Irvine Co. and Macerich with similar duration letters of credit (or similar form of additional assurance), up to a maximum of six (6) months (as measured by the terms of the leases with Irvine Co. and Macerich).  For clarity, if Purchaser agrees to provide an Other Objecting Landlord with a letter of credit equaling four (4) months rent and other charges, then Purchaser will provide Irvine Co. and Macerich with letters of credit equal to four (4) months of the respective monthly charges for the Fashion Island, Kierland Commons and Scottsdale Fashion Square locations.  If, however, Purchaser agrees to provide such Other Objecting Landlord with a letter of credit equaling seven (7) months rent and other charges, then Purchaser will provide Irvine Co. and Macerich with letters of credit equal to six (6) months of the respective monthly charges for the Fashion

Island, Kierland Commons and Scottsdale Fashion Square locations. Purchaser, Irvine Co., and Macerich agree that the metric for comparing letters of credit (or similar form of additional assurance) is the relative months of coverage of rent and other charges under the terms of the relevant leases, as opposed to the total financial value of each such letter of credit (or similar form of additional assurance. The terms of this paragraph shall apply even if the agreement between Purchaser and an Other Objecting Landlord is the result of an order of the Court where Purchaser has elected to provide additional adequate assurance to such Other Objecting Landlord rather than terminate the Asset Purchase Agreement.

10. With respect to the lease of the property located in the Mall at Short Hills, Short Hills, New Jersey (the "Short Hills Lease"), said lease shall not be assumed and/or assigned to Purchaser. Instead, the Short Hills Lease will be terminated based upon the agreement of the parties read on the record, and will be subject of a stipulation to be submitted separately.

11. Except as otherwise provided herein, upon the assumption and assignment of any Assumed Contract, the Debtor and its bankruptcy estate shall be relieved of any liability for breach of any such Assumed Contract occurring after such assignment pursuant to section 365(k) of the Bankruptcy Code.

12. Subject to the provisions hereof, no cure payment or other form of compensation is required in connection with the assumption of any Assumed Contract, except as specifically provided in the Cure Schedule. With respect to the objections to the Cure Schedule (the "Cure Objections") filed by Maxtana, LLC ("Maxtana"), Irvine Co.; Macerich; RREEF Management Company ("RREEF"), Westfield, LLC ("Westfield"); Short Hills, Cherry Creek; and Bellevue the following procedures shall apply:

(a) A continued hearing on the Cure Objections will be conducted on August 12, 2008, at 2:00 pm. Replies to the Cure Objections by the Debtor or other interested parties, including the Committee, must be filed by no later than August 1, 2008. The objecting landlords must file responses to any reply by no later than August 7,

2008. Pending the continued hearing on the Cure Objections, the Debtor shall hold in trust an amount sufficient to pay the amount claimed by the objecting landlords in the Cure Objections, less the amount in the Cure Schedule, less any payments received from the Debtor pending the final hearing on the Cure Objections.

(b)     With respect to the objections by Irvine Co, relating to unreconciled common area maintenance and property tax charges, said landlord must present its reconcilliation of all amounts due through the closing to the Debtor and the Committee by no later than 60 days from the entry of this order. The Debtor shall promptly pay said amounts upon receipt of the reconciliation, unless there is a dispute as to the amount of the reconciliation. In the case of a dispute, the Debtor will file an appropriate motion with the Court seeking a resolution of the dispute. As further adequate assurance of future performance with respect to the lease of Cherry Creek, the Purchaser shall assume the liability and be assigned the credit for any year-end adjustments and reconciliations for charges under the lease, including property tax and common area maintenance charges incurred prior to the Closing, in accordance with the specific terms and conditions of the lease.

(c)     As adequate assurance of the cure of the asserted default relating to the mechanics liens, including liens asserted by the general contractor, J. Hage Construction, LLC ("J. Hage"), and certain subcontractors (the "Sub-Contractor Liens"), arising out of the Debtor's construction of the store at the Cherry Creek Shopping Mall (the "Cherry Creek Store") the Debtor shall reserve from the proceeds of the sale (the "Sale Proceeds') in an interest bearing account the sum of $202,000 (the "Cherry Creek Escrow"), to be held by Debtor's counsel. No disbursements shall be made absent (a) written consent of the Debtor, the Committee, and Taubman; or (b) further order of this Court. Taubman, Debtor, the Committee, and J. Hage, shall agree to work in good faith to agree on a mechanism for disbursement of the funds, which mechanism shall include (a) payment and extinguishment of all liens recorded against the Cherry Creek Store; (b) recordation of lien release bonds in the appropriate statutory form if there is a dispute as

to the amount of any lien filed by a subcontractor hired by J. Hage; or (c) a combination of the foregoing. J. Hage's claims shall be satisfied in full by its receipt of the balance of the Cherry Creek Escrow, after all Sub-Contractor Liens have been paid in full. In the event that the Debtor, J. Hage, the Committee, and Taubman are unable to reach an agreement regarding such mechanism, within 7 days of the issuance of this Order, any of the parties may file a motion with the Court seeking a resolution of any disagreement in this regard. Upon satisfaction of the claims related to the construction of the Cherry Creek Store pursuant to these provisions, and satisfaction of provisions Section 5.01(b) of the Lease, and Exhibit B, Section VI (F)1(a)-(f) to the Lease, Taubman shall promptly pay to the Debtor the tenant allowance provided for under the Debtor's Lease, in the amount of $122,200. The payment shall be made pursuant to wire transfer instructions to be provided by the Debtor.

13. With respect to any third-party claims asserted against a landlord arising with respect to pre-Closing Date events for which landlord has a right of indemnification under the terms of an applicable lease, nothing herein prevents such landlord from exercising any rights it may have to the proceeds or benefits of any of Debtor's insurance policies and/or to seek reimbursement of landlord's damages on account of such third party claims.

14. Pursuant to 11 U.S.C. §365 and stipulation between New Breed, a North Carolina Corporation ("New Breed"), the Debtor and Purchaser, the Debtor is authorized to assume that certain executory contract between the Debtor and New Breed entitled Warehousing, Fulfillment ad Distribution Services Agreement and dated January 17, 2005 as it may have been subsequently amended and modified ("New Breed Contract") and to assign said New Breed Contract to the Purchaser. Right Start Acquisition Company shall guaranty the obligations of the Purchaser under the assigned and amended New Breed Contract. The terms and conditions upon which the Debtor is authorized to assume and assign the New Breed Contract are more fully set forth in that certain Term Sheet attached hereto as Exhibit 2 to this Order. In addition to the terms as

set forth in Exhibit 2 the following terms and conditions shall apply as conditions precedent to full consummation of the assumption and assignment of the New Breed Contract:

  (a)  The cure payment asserted by New Breed is $314,640.31. The amount which New Breed will accept to fully satisfy its cure claim is $157,320.16 (the "Cure Amount"). The Cure Amount shall be paid upon the Closing of the sale as defined herein.

  (b)  Upon Closing, the Debtor and the Debtor's estate waive any and all causes of action which it may have against New Breed under 11 U.S.C. §§544, 545, 547, 548 and 549. Said waiver shall by binding upon the Debtor's successors and assigns, and in the event of the appointment of a Chapter 11 trustee or conversion to Chapter 7 and the appointment of a Chapter 7 trustee, such trustees.

  (c)  The notice required to be given before termination of the New Breed Contract shall be 120 days.

  (d)  Upon payment of the Cure Amount and consummation of the assumption and assignment of the New Breed Contract as provided for herein, New Breed waives any and all claims which it may have in the estate of the Debtor, or the Transferred Assets.

  Further terms and conditions as set forth in Exhibit 2 set forth the substance of the stipulation between the Debtor, New Breed and the Purchaser which modify the underlying New Breed Contract and do not provide full and complete cure of the pre-petition defaults of the Debtor regarding the New Breed Contract. Notwithstanding, the terms and conditions set forth in Exhibit 2 New Breed shall not be required to accept the assumption and assignment of the New Breed Contract unless and until the terms and conditions as set forth in Exhibit 2 have been fully and completely documented in a fully executed Assignment Agreement acceptable to the Debtor, New Breed and the Purchaser. Except as modified by the Assignment Agreement the New Breed Contract shall remain in full force and effect upon execution of the contemplated Assignment

1  Agreement with the proviso that all modifications as set forth in Exhibit 2 as to pricing and
2  minimums shall become effective upon the first business day following Closing. The
3  Purchaser, New Breed and the Debtor shall act in good faith in negotiating, documenting
4  and executing such an Assignment Agreement within 15 calendar days from the date of
5  entry of this Order the New Breed Contract . In the event that the parties cannot reach
6  an agreement regarding the specific terms and conditions of the Assignment Agreement,
7  the Court shall retain jurisdiction to resolve any such disputes.

8        15.    Notwithstanding any other provision contained in this Order, the
9  assumption and assignment of the Oracle license as listed in Schedule 1.1(h) to the
10 Purchase Agreement and the Modified Assumption List is approved subject only to final
11 documentation of an appropriate assumption and assignment agreement reasonably
12 acceptable to Oracle and the Purchaser.

13       16.    The transfer of the Assets to Purchaser pursuant to the Purchase
14 Agreement constitutes a legal, valid and effective transfer of the Assets, and shall vest
15 Purchaser with all right, title and interest of the Debtor in and to the Assets free and clear
16 of all Liens, Claims and interests of any kind or nature whatsoever.

17       17.    On the Closing Date, this Order shall be construed and shall
18 constitute for any and all purposes a full and complete general assignment, conveyance
19 and transfer of the Assets or a bill of sale transferring good and marketable title in the
20 Assets to Purchaser.

21       18.    With respect to the claim of Wachovia Capital Finance Corporation
22 (Western), the Debtor is authorized and shall pay, at the Closing of that portion of
23 Wachovia's claim agreed by the Debtor and the Committee to be undisputed. The
24 Debtor shall segregate funds sufficient to cover (a) the disputed portion of Wachovia's
25 claim, if any, (b) interest on disputed portion of Wachovia's claim, (c) attorney's fees to
26 litigate over disputed portion of Wachovia's claim (in an amount to be agreed upon by the
27 Debtor, the Committee and Wachovia), (d) Wachovia's attorneys fees and costs for the
28 month of July, 2008 according to proof provided by Wachovia; and (e) Wachovia's

disputed claim for post-petition default interest. The Debtor, Committee and Wachovia shall request that the Court set a briefing schedule to resolve any dispute regarding Wachovia's claim.

19.  This Order is and shall be effective as a determination that, all Liens shall be, and are, without further action by any person or entity, released with respect to the Transferred Assets as of the Closing Date and shall attach to the Sale proceeds with the same validity and priority as existed with respect to the Transferred Assets.

20.  The transactions contemplated by the Purchase Agreement are undertaken by Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale to Purchaser, unless such authorization is duly stayed pending such appeal. Purchaser is a good faith purchaser of the Transferred Assets, and is entitled to all of the benefits and protections afforded by section 363(m) of the Bankruptcy Code.

21.  This Court retains jurisdiction to enforce and implement the terms and provisions of the Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and including, without limitation, any and all documents, instruments, certificates and agreements entered into in connection with the Purchase Agreement, in all respects, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Transferred Assets to Purchaser, (b) resolve any disputes arising under or related to the Purchase Agreement, except as otherwise provided therein, and (c) interpret, implement and enforce the provisions of this Sale Order.

22.  All entities who are presently, or on the Closing Date may be, in possession of some or all of the Assets hereby are directed to surrender possession of the Assets either to (a) the Debtor prior to the Closing Date, for subsequent transfer to Purchaser on the Closing Date, or (b) to Purchaser on the Closing Date.

23.  On or before the Closing Date, each of the Debtor's secured creditors is authorized and directed to execute and deliver such documents and take all

other actions as may be necessary to release its Liens and interests in the Transferred Assets, if any, as such Liens and interests may have been recorded or otherwise exist.

24. The Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtor or its estate.

25. The failure specifically to include any particular provision of the Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Purchase Agreement be authorized and approved in its entirety.

26. Immediately upon the entry of this Order, this Order will constitute a final and appealable order within the meaning of 28 U.S.C. § 158(a). This Order shall be effective immediately upon entry and the ten-day stay provisions pursuant to Bankruptcy Rules 6004(g) and 6006(d) are hereby waived.

27. Pursuant to the order ("ABKC Employment Order") approving the Employment of Alexander B. Kasdan Company ("ABKC"), as Investment Banker for the Debtor, the ABKC is entitled to be paid its Transaction Fee (as that term is defined in the ABKC Employment Order) upon the closing of the proposed Sale. It is hereby ordered that the Debtor is authorized and directed to pay to ABKC at, and as a condition of, Closing, a fee of $330,000. Payment of this fee will constitute payment in full of any fee owed to ABKC by the Debtor and/or the bankruptcy estate. The Debtor is authorized and directed to pay the fee on Closing of the Sale.

28. The Stipulation between Debtor, Official Unsecured Creditors' Committee, and "Bridge Lenders", Oak Investment Partners, IX, Oak IX Affiliates Fund, Oak IX Affiliates Fund-A, GRP II, L.P., GRP II Partners, L.P., And GRP II Investors, L.P. Regarding Ancillary Issues Related To Sale Approval Motion, is approved.

DATED: 7/16/08

_____
HON. SAMUEL L. BUFFORD
UNITED STATES BANKRUPTCY JUDGE

PRESENTED BY:

**Sulmeyer**Kupetz
A Professional Corporation

By: _____
~~David S. Kupetz~~
Mark S. Horoupian
Attorneys for eStyle, Inc., Debtor in Possession